FILED
CLERK, U.S. DISTRICT COURT

09/21/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

April 2021 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 2:21-cr-00442-FMO |
| Plaintiff, | I N D I C T M E N T |
| v. | [50 U.S.C. § 1705(a) and (c): Conspiracy to Violate the International Emergency Economic Powers Act; 31 C.F.R. §§ 560.203, 560.204, 560.206; 560.427] |
| SEYED ZIAEDDIN TAHERI ZANGAKANI, SAEED TORAB ABTAHI, ABBAS AMIN, ISSA SHAYEGH, MOJTABA DEHGHANI, SARA SABRI, REZA KARIMI, SHANTIA CHUPRA, SALIM HENAREH, and KHALIL HENAREH, | |
| Defendants. | |

The Grand Jury charges:

## Introductory Allegations

At all times relevant to this Indictment:

A. <u>The ROSCO ENTITIES</u>

1. Defendants SEYED ZIAEDDIN TAHERI ZANGAKANI ("ZANGAKANI"), SAEED TORAB ABTAHI ("ABTAHI"), ISSA SHAYEGH ("SHAYEGH"), SALIM HENAREH ("HENAREH"), and KHALIL HENAREH ("KHALIL") each owned or were employed by companies in Canada and the U.A.E. associated with money services businesses in Iran:

a. Rosco Trading LLC ("ROSCO TRADING") was a company based in the United Arab Emirates ("U.A.E.") that purported to assist Canadian suppliers with the purchase of products, raw materials, heavy industrial equipment, and special machinery. Defendant ZANGAKANI owned 5% of ROSCO TRADING.

b. Rosco Trading International Ltd. ("ROSCO INTL") was a currency exchange business located in Toronto, Canada, which provided exchange services for at least 40 international currencies.

c. ROSCO INTL was co-located with and did business as Persepolis International Ltd. ("PERSEPOLIS"), a registered Money Services Business ("MSB") in Canada.

d. Defendant HENAREH owned 44% of ROSCO TRADING and was the principal and president of ROSCO INTL. Defendant HENAREH was also the president of PERSEPOLIS.

e. Defendant KHALIL served as a compliance and operations employee for ROSCO INTL. KHALIL was the Information Technology and Operations Manager for PERSEPOLIS, and KHALIL also registered and operated web domains for PERSEPOLIS, among other companies.

f. Defendant ABTAHI was a national of Canada and Iran and served as the Vice President of ROSCO INTL.

g. Defendant SHAYEGH was a citizen of Iran and was a foreign currency "specialist" for PERSEPOLIS.

2

h.   ROSCO TRADING shared a physical address with Rosco Investment International LLC ("ROSCO INVESTMENT") in the U.A.E.

i.   KHALIL was the registrant contact, technical contact, administrative contact, and billing contact for the ROSCO INVESTMENT domain name.

j.   Collectively, ROSCO TRADING, ROSCO INTL, PERSEPOLIS, and ROSCO INVESTMENT, are hereinafter referred to as the "ROSCO ENTITIES."

B.   The ROSCO ENTITIES' Affiliates in Iran

2.   Defendant REZA KARIMI ("KARIMI") was an employee of a money exchange in the U.A.E. and provided advice to ZANGAKANI and the ROSCO ENTITIES regarding how to evade sanctions on Iran.

3.   KHALIL registered a website for an Iranian currency exchange business, Rosco Exchange ("ROSCO EX"), which publicly displayed and advertised the "Rosco," "Persepolis," and "Henareh" names.

4.   ROSCO EX was located in Tehran, Iran, but its domain subscriber contact information shared a telephone number and address with ROSCO INTL and PERSEPOLIS in Canada.

5.   KHALIL registered the ROSCO EX website "sarafipersepolis.ir."  The domain holder for the ROSCO EX website was a company located in Shiraz, Iran.  The company's online profile publicly referenced ROSCO EXCHANGE, PERSEPOLIS, and HENAREH.

6.   Defendant ABBAS AMIN ("AMIN") was a citizen of Iran and the Credit Finance Manager for an Iran-based petrochemical company (hereinafter "IRAN PETROCHEMICAL COMPANY 1").

7.   Defendant SARA SABRI ("SABRI") was a "Commercial Expert" for Compressor Tech Trading ("COMPRESSOR TECH"), a front company

3

purportedly based in the U.A.E. but that actually operated in Iran, as detailed further below.

8. Defendant SHANTIA CHUPRA ("CHUPRA") was also an employee of the COMPRESSOR TECH front company.

9. Defendant MOJTABA DEHGHANI ("DEHGHANI") was a citizen of Iran and an employee within the financial department of a manufacturing company based in Iran (hereinafter "IRAN MANUFACTURING COMPANY 1").

10. "IRAN MINERAL COMPANY 1" was an Iran-based company that specialized in mineral processing and the import and export of goods and equipment, among other activities.

11. The NATIONAL IRANIAN OIL COMPANY ("NIOC") was a petrochemical company based in Iran owned by the Government of Iran.

12. The NATIONAL IRANIAN TANKER COMPANY ("NITC") was an Iranian oil tanker company based in Iran and a subsidiary of NIOC.

13. The NATIONAL PETROCHEMICAL COMPANY ("NPC") is a petrochemical company based in Iran and owned by the Government of Iran.

14. IRAN HOLDING COMPANY 1 was a financial services company based in Iran.

C. Additional Entities Based in the U.A.E., Canada, Greece, Hong Kong, Malaysia, South Korea, and the Central District of California

15. Beginning in 1999, HENAREH served as President of Persepolis Financial Services, Inc. ("PERSEPOLIS FINANCIAL"), a corporation previously based in the Central District of California. SHAYEGH, was the vice president of PERSEPOLIS FINANCIAL.

16.   EURAMIKA GENERAL TRADING FZE ("EURAMIKA") was a front company based in Canada and the U.A.E. used by the conspirators to facilitate U.S.-dollar transactions.

17.   HAMILTON FAHO TRADING ("HAMILTON FAHO") was a front company based in the U.A.E. used by the conspirators to facilitate U.S.-dollar transactions.

18.   "MALAYSIA PETROCHEMICAL COMPANY 1" was based in Malaysia and was a supplier of petrochemical equipment.

19.   "ENERGY COMPANY 1" was a business based in South Korea.

20.   "BUSINESSPERSON A" was a Greek businessman who repeatedly helped Iran evade U.S. sanctions by laundering Iranian funds to purchase multiple oil tankers and disguising the Iranian origin of oil transported on the vessels.

21.   "SHIPPING COMPANY 1" was BUSINESSPERSON A's shipping company in Greece, which BUSINESSPERSON A used to purchase oil tankers while disguising the fact that the tankers were being purchased on behalf of the NITC.

22.   "SHIPPING COMPANY 2" was another shipping company in Greece, which BUSINESSPERSON A used to purchase and operate purchased on behalf of NITC with the aim of loading them with Iranian oil supplied by the NIOC.

23.   The "OCEAN PERFORMER" and the "ZAP" were two oil tankers acquired by BUSINESSPERSON A.  The OCEAN PERFORMER's International Maritime Organization ("IMO") number - a unique identifier for ships, registered ship owners, and management companies – was 9013749.  The ZAP's IMO number was 9005235.

24.   TOTAL EXCELLENCE LIMITED ("TOTAL EXCELLENCE") was a Hong Kong-based front company used by the conspirators to facilitate U.S.-

dollar transactions on behalf of Iran.  HENAREH was a part-owner of TOTAL EXCELLENCE.

25.  Global Elite Industrial Plant Equipment and Spare Parts Trading LLC ("GLOBAL INDUSTRIAL") was a U.A.E.-based front company used by the conspirators to facilitate U.S.-dollar transactions on behalf of Iran.

26.  Globalelite Trading a/k/a Global Elite Inc ("GLOBAL ELITE") was a Hong Kong-based front company used by the conspirators to facilitate U.S.-dollar transactions on behalf of Iran.

27.  EXPROM TRADING FZE ("EXPROM") was a U.A.E.-based front company used by the conspirators to facilitate U.S.-dollar transactions on behalf of Iran.

D.   Relevant Financial Institutions

28.  "U.S. FINANCIAL INSTITUTION 1" was a financial institution headquartered in New York, New York, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

29.  "U.S. FINANCIAL INSTITUTION 2" was a financial institution headquartered in New York, New York, whose deposits were insured by the FDIC.

30.  "U.K. FINANCIAL INSTITUTION 1" was a U.K. financial institution with offices located in New York, New York.

31.  "U.A.E. FINANCIAL INSTITUTION 1" was a financial institution based in the U.A.E. with offices located in New York, New York.

32.  U.S. correspondent bank accounts were accounts held by financial institutions in the United States, including U.S. FINANCIAL INSTITUTION 1, U.S. FINANCIAL INSTITUTION 2, U.K. FINANCIAL INSTITUTION 1, and U.A.E. FINANCIAL INSTITUTION 1 that effectively

convert foreign currency into U.S. dollars for withdrawals and deposits on behalf of foreign banks.

33.   During the conspiracy, defendants ZANGAKANI, ABTAHI, AMIN, SHAYEGH, DEHGHANI, SABRI, KARIMI, CHUPRA, HENAREH, and KHALIL, and others known and unknown to the Grand Jury, disguised a total of more than $750,000,000 worth of transactions on behalf of Iran.

COUNT ONE

[50 U.S.C. § 1705(a), (c),

31 C.F.R. §§ 560.203, 560.204, 560.206; 560.427]

The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 33, above, as if fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

Beginning at least as early as in or around March 2002 and continuing up to and including at least in or around August 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendants SEYED ZIAEDDIN TAHERI ZANGAKANI ("ZANGAKANI"), SAEED TORAB ABTAHI ("ABTAHI"), ABBAS AMIN ("AMIN"), ISSA SHAYEGH ("SHAYEGH"), MOJTABA DEHGHANI ("DEHGHANI"), SARA SABRI ("SABRI"), REZA KARIMI ("KARIMI"), SHANTIA CHUPRA ("CHUPRA"), SALIM HENAREH ("HENAREH"), and KHALIL HENAREH ("KHALIL"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit offenses against the United States, namely:

1.   To knowingly and willfully enter into transactions that evaded and avoided, and had the purpose of evading and avoiding, the regulations governing trade and exports from the United States to Iran, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203;

2.   To export, sell, and supply, and to attempt to export, sell, and supply, goods, technology and services, namely banking and other financial services, from the United States to Iran, in violation of the regulations that govern trade and exports to Iran, without first having applied for, or through such application

8

obtained, from the United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), a license or authorization for such export, in violation 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. §§ 560.204, 560.427; and

3.   To engage in a transaction and dealing in and related to goods, technology, and services for exportation, reexportation, sale and supply, by a United States person wherever located, to Iran, without first having applied for, or through such application obtained from OFAC, a license or authorization for such export, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.206.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1.   Defendants ZANGAKANI, SHAYEGH, KARIMI, and ABTAHI would discuss how to evade U.S. sanctions against Iran by disguising U.S. fund transfers on behalf of Iranian oil companies through front companies outside of Iran and fraudulent documents falsely indicating that the U.S.-dollar transactions did not involve Iran.

2.   Defendants ZANGAKANI, ABTAHI, AMIN, SHAYEGH, DEHGHANI, SABRI, KARIMI, CHUPRA, HENAREH, and KHALIL would create front companies and prepare fraudulent invoices on behalf of Iranian oil companies.

3.   Defendants ZANGAKANI, ABTAHI, AMIN, SHAYEGH, DEHGHANI, SABRI, KARIMI, CHUPRA, HENAREH, and KHALIL's false representations would cause U.S.-dollar wire transfers to be executed by U.S. financial institutions on behalf of Iranian oil companies.

C.   <u>OVERT ACTS</u>

In furtherance of the conspiracy and to accomplish its objects, defendants ZANGAKANI, ABTAHI, AMIN, SHAYEGH, DEHGHANI, SABRI, KARIMI, CHUPRA, HENAREH, KHALIL, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, on or about the dates identified below, including but not limited to the following:

<u>The Conspirators Discuss Sanctions Avoidance</u>

<u>Overt Act No. 1:</u>   On or about March 1, 2002, a California state law enforcement undercover officer ("UC") contacted PERSEPOLIS FINANCIAL at its publicly listed telephone number in Encino, California.  The UC spoke with ZANGAKANI.  During the call, ZANGAKANI told the UC how to surreptitiously send money from the United States to Iran and provided the UC with an Iranian currency to U.S. dollar exchange rate.  ZANGAKANI also directed the UC to PERSEPOLIS FINANCIAL in Encino, where the UC ultimately met SHAYEGH in-person.

<u>Overt Act No. 2:</u>   On or about January 17, 2012, ZANGAKANI and SHAYEGH communicated via email about "American Hawalas/ Transactions" from an employee of ROSCO INTL.  The email indicated that ZANGAKANI would be "introduced" to "American customers" and provided instructions on how to calculate the Toman rate, a superunit of the official currency of Iran, the Rial, and how to add a Toman fee for American transactions.

<u>Overt Act No. 3:</u>   On or about August 8, 2012, ZANGAKANI emailed SHAYEGH a copy of an invoice for a U.S.-dollar payment made on behalf of an Iranian company for gas and oil.

<u>Overt Act No. 4:</u>   On or about May 14, 2014, ZANGAKANI sent SHAYEGH business cards identifying SHAYEGH as the "International

Specialist of the Foreign Currency" for PERSEPOLIS.  In addition to offices in Toronto and Dubai, SHAYEGH's business cards stated that PERSEPOLIS has an office in Tehran, Iran.

Overt Act No. 5:   On or about June 18, 2012, KARIMI sent ZANGAKANI an email discussing how to surreptitiously transfer funds from Iran to accounts in Canada and evade economic sanctions, including under sanctions imposed by U.S. law.

Overt Act No. 6:   On or about December 12, 2012, ABTAHI sent ZANGAKANI an email attaching an OFAC publication that provided an overview of OFAC regulations involving sanctions against Iran.  The document was titled, "What You Need To Know About U.S. Economic Sanctions."

Overt Act No. 7:   On or about December 12, 2012, ZANGAKANI forwarded ABTAHI's email to AMIN who was an employee of IRAN PETROCHEMICAL COMPANY 1.

Overt Act No. 8:   On or about June 4, 2013, ABTAHI emailed ZANGAKANI a U.S. Department of the Treasury website link and stated in Farsi, "look at this chart.  It's new."  The link provided a U.S. Treasury PDF document titled, "The Execution of Imam Khomeini's Order ("EIKO"), International Financial Network," which was described as a major network of front companies controlled by Iranian government leadership and tasked with evading U.S. sanctions.  According to the PDF, the stated purpose of the network was to generate and control massive, off-the-books investments shielded from the view of the Iranian people and international regulators.

Overt Act No. 9:   On or about July 19, 2016, ABTAHI sent ZANGAKANI an email with an attachment and stated, "Please see after page 35.  This became effective after June 16, 2010."  The attachment

was OFAC's Specially Designated Nationals and Blocked Persons List

("SDN") list.  Page 35 of the document was the start of Iranian

companies added to the OFAC SDN list on June 16, 2010.  The heading

for the list was highlighted in yellow.  Beginning on page 37,

multiple Iran-based companies were highlighted, including NIOC and

NPC.

Overt Act No. 10:   On or about July 19, 2016, ZANGAKANI

forwarded the attachment regarding OFAC enforcement and NIOC and NPC

from ABTAHI to AMIN at IRAN PETROCHEMICAL COMPANY 1.

Overt Act No. 11:   On or about July 19, 2016, ZANGAKANI

forwarded a U.S. Department of Treasury link for OFAC enforcement

regarding NPC from ABTAHI to AMIN at IRAN PETROCHEMICAL COMPANY 1.

U.S. Dollar Transfers to Malaysian Oil Company on Behalf of Iran

Overt Act No. 12:   On or about April 23, 2012, AMIN emailed

ZANGAKANI about "payment splits for MALAYSIA PETROCHEMICAL COMPANY

1."  The email discussed how to structure the payments "in order to

not create any possible problems[.]"

Overt Act No. 13:   On or about April 24, 2012, ROSCO TRADING

LLC sent $2,000,000 to MALAYSIA PETROCHEMICAL COMPANY 1 via wire

transfer.  The correspondent U.S. dollar transaction was processed by

U.K. FINANCIAL INSTITUTION 1's offices in New York.

Overt Act No. 14:   On or about October 11, 2012, AMIN sent an

email to ZANGAKANI titled "Fw: Service Invoice - IRAN PETROCHEMICAL

COMPANY 1."  AMIN stated, "Pls find attached the required invoices."

The email attached four MALAYSIA PETROCHEMICAL COMPANY 1 commercial

invoices for "piping material" in the amount of $6,000,000.  The

listed "customer" was an oil entity with an address in Tehran, Iran.

<u>Overt Act No. 15:</u>  On or about October 11, 2012, AMIN forwarded an email to ZANGAKANI in which AMIN asked the managing director of MALAYSIA PETROCHEMICAL COMPANY 1 in Malaysia to issue the invoice to a different entity instead of the "existing" company.  In his email, AMIN attached new signed invoices for the $6,000,000 purchase matching the prior invoices except for the customer.  The new invoices removed reference to the oil entity and its address in Tehran, and deleted any mention of ROSCO TRADING LLC in the description block, replacing the "customer" with a different entity, HAMILTON FAHO TRADING ("HAMILTON FAHO"), purportedly located in the U.A.E.

<u>Overt Act No. 16:</u>  On or about November 1, 2012, ZANGAKANI received an email attaching a spreadsheet with a tab titled, "Rosco Investment International LLC, Statement of Account," discussing fund transfers and fees to the oil entity for MALAYSIA PETROCHEMICAL COMPANY 1 on behalf of Iranian oil companies.

<u>Overt Act No. 17:</u>  On or about December 5, 2012, HAMILTON FAHO sent $6,000,000 from its Emirates NBD account in the U.A.E. to MALAYSIA PETROCHEMICAL COMPANY 1's account in Malaysia.  The correspondent U.S. dollar transactions were processed U.K. FINANCIAL INSTITUTION 1's offices in New York.

<u>U.S. Dollar Transactions on Behalf of IRAN MANUFACTURING COMPANY 1</u>

<u>Overt Act No. 18:</u>  On or about December 4, 2013, DEHGHANI sent ZANGAKANI an email titled, "very very urgent."  The email included a list of companies with bank account details and amounts in U.S. dollars, Euro, and dirhams, the currency of the U.A.E.  One of the companies was a Japan-based company with the amount $360,520.99 USD.

Overt Act No. 19:   On or about December 13, 2013, ZANGAKANI sent an email to DEHGHANI titled "Fw: IRAN MANUFACTURING COMPANY 1." In the body of the email ZANGAKANI stated, "please find the attachment."  The attachment was a "statement of account" for IRAN MANUFACTURING COMPANY 1 in multiple currencies.  According to the statement, on December 9, 2013, IRAN MANUFACTURING COMPANY 1's account was debited $360,520.99 for a payment to a Japan-based company.

Overt Act No. 20:   On or about December 14, 2013, after a U.A.E. FINANCIAL INSTITUTION 1 representative asked ZANGAKANI for additional information related to a transaction in which EURAMIKA GENERAL TRADING FZE wired $360,520.99 USD to a Japan-based company, including "attestation that funds are not related to Iran, or any other OFAC sanctioned country," ZANGKANI sent an email to DEHGHANI, the IRAN MANUFACTURING COMPANY 1 employee, asking that DEHGHANI create a fraudulent invoice for EURAKIMA GENERAL TRADING FZE.

Overt Act No. 21:   On or about December 16, 2013, DEHGHANI provided an invoice which listed EURAMIKA TRADING FZE in the U.A.E. as the purchaser.  The invoice was for the purchase of steel tubing.

Overt Act No. 22:   On or about December 16, 2013, ZANGAKANI emailed the U.A.E. FINANCIAL INSTITUTION 1 representative and stated, "We would like to inform you that The Buyer Company 'Euramika General Trading FZE' is Established in United Arab Emirates and Goods being purchased are not Itemised in OFAC Sanctioned country."  ZANGAKANI also provided the representative with the falsified invoice that had been prepared by DEHGHANI, the IRAN MANUFACTURING COMPANY 1 employee based in Shiraz, Iran.

Overt Act No. 23:   On or about December 16, 2013, as a result of the misrepresentations above, ZANGAKANI and DEHGHANI caused U.A.E. FINANCIAL INSTITUTION 1's New York branch to process the $360,520.99 transaction

Oil Tanker Purchases on Behalf of Iran

Overt Act No. 24:   On or about August 13, 2012, BUSINESSPERSON A emailed ZANGAKANI with information regarding a bank account in Athens, Greece capable of accepting U.S.-dollar wire transfers. ZANGAKANI then forwarded this information to AMIN at IRAN PETROCHEMICAL COMPANY 1.  AMIN responded and stated, "We'll correct our letter to you with USD A/C number."

Overt Act No. 25:   On or about August 23, 2012, BUSINESSPERSON A emailed ZANGAKANI and told him that BUSINESSPERSON A's Athens-based bank was cross-checking the source of funds being wired into the account by TOTAL EXCELLENCE LIMITED.  In response, ZANGAKANI wrote to BUSINESSPERSON A with a description of TOTAL EXCELLENCE LIMITED's purported business operations; in particular, ZANGAKANI claimed that TOTAL EXCELLENCE LIMITED was a "global company in the construction machinery industry" that supplied "heavy equipment brands." ZANGAKANI also claimed that TOTAL EXCELLENCE LIMITED invested in construction and transportation businesses, including a "shipping fund" to acquire an oil tanker.

Overt Act No. 26:   On or about August 28, 2012, BUSINESSPERSON A emailed ZANGAKANI two invoices (on SHIPPING COMPANY 1 letterhead) for the purchase of the following two oil tankers:  (1) the YIOMARAL, with IMO Number 9005235 (the number assigned to the ZAP) and a total purchase price of $26,150,000; and the OLYMPIC LOYALTY, with IMO Number 9013749 (the number assigned to the OCEAN PERFORMER) and a

15

total purchase price of $25,500,000; the names of the ZAP and the OCEAN PERFORMER were changed (to YIOMARAL and OLYMPIC LOYALTY, respectively) in an attempt to disguise the transfer.  According to the invoices, TOTAL EXCELLENCE would wire an initial payment of $942,200 USD as part of the acquisition of the OLYMPIC LOYALTY, and an initial payment of $1,212,800 USD as part of the acquisition of the YIOMARAL.

Overt Act No. 27:  On or about September 7, 2012, ZANGAKANI received an email with a spreadsheet regarding ROSCO INVESTMENT's "statement of account" for IRAN PETROCHEMICAL COMPANY 1 (among other transactions).  The spreadsheet included an August 13, 2012 line item indicating that the IRAN PETROCHEMICAL COMPANY 1 account was debited "2,155,000.00," the exact combined total U.S. dollar value of the initial payments wired to BUSINESSPERSON A for the two oil tankers.

The Creation of New U.A.E. Front Companies on Behalf of Iran

Overt Act No. 28:  On or about June 8, 2014, SABRI emailed ZANGAKANI about the creation of a new front company, COMPRESSOR TECH. SABRI asked ZANGAKANI to "[r]efer to [the] confirmation of [the] managing director," and to "note" that "we're going to add Rosco's address, tell numbers and fax numbers as below in Compressor tech's letterhead & our electronic signature pls confirm."  SABRI also asked ZANGAKANI to "provide 2 sim cards for us (not credit sim cards) with roaming in Iran for unlimited duration as soon as possible; we need sim cards that Etisalat issues bill monthly."  Within the email, SABRI indicated that the new address for COMPRESSOR TECH would be the same address used by ROSCO TRADING and ROSCO INVESTMENT in the U.A.E.

Overt Act No. 29:  On or about June 10, 2014, SABRI emailed ZANGAKANI again and stated, "Further to our conversation as I

explained inserting Rosco's address in our letter head is ok and doesn't make problem for no one, even current address on our letter head is related to another co."

Overt Act No. 30:   On or about June 24, 2014, SABRI emailed ZANGAKANI again and asked him to "note we announced relocation of Compressor tech trading as following email to all business partners." SABRI asked ZANGAKANI to please "give necessary notice to your operator" when "our partners" call a specific telephone number and "ask[] to talk with someone is compressor tech trading [sic]."   SABRI also warned ZANGAKANI not to "release [that] we're not there and we locate in Iran," because "all of suppliers supply sanctioned goods and they don't know anything about Iran at all."

Overt Act No. 31:   On or about June 24, 2014, ZANGAKANI received an email from an employee of IRAN PETROCHEMICAL COMPANY 1, the Iranian oil company, telling ZANGAKANI that the name of the "new company" was EXPROM TRADING FZE ("EXPROM"), another front company. After ZANGAKANI asked for information regarding the activity of EXPROM, the IRAN PETROCHEMICAL COMPANY 1 employee responded, "General trading, same as compressor tec."

**Defendants Secretly Sell $1,000,000 worth of Iranian Oil Equipment to South Korea in a Transaction Processed by a U.S. Bank**

Overt Act No. 32:   On or about May 21, 2016, SABRI emailed ZANGAKANI to create a new invoice to receive a $1,000,000 payment from ENERGY COMPANY 1, in South Korea, on behalf of IRAN MINERAL COMPANY 1.

Overt Act No. 33:   On or about May 21, 2016 ZANGKANI responded via email by providing SABRI with an invoice listing ENERGY COMPANY 1 as the "buyer" and a U.A.E. front company - Prime Elite FZE ("PRIME

17

ELITE") - as the beneficiary.  The invoice provided by ZANGAKANI omitted key details about the transaction, such as the dollar amount, the date, and the seller.

Overt Act No. 34:  On or about May 22, 2016, SABRI responded to ZANGAKANI via email by filling in missing details on the invoice to indicate that ENERGY COMPANY 1 would pay PRIME ELITE a total of $1,000,000 USD.

Overt Act No. 35:  On or about October 15, 2016, despite SABRI and ZANGAKANI purportedly selecting PRIME ELITE as the company that would receive the ENERGY COMPANY 1 payment, an ENERGY COMPANY 1 representative emailed SABRI about "bank information for 'IRAN MANUFACTURING COMPANY 1,' CCWS maker of IRAN MINERAL COMPANY 1 project."  The ENERGY COMPANY 1 representative told SABRI that the bank information was incorrect and had been rejected, and asked SABRI to check the bank information for PRIME ELITE again.

Overt Act No. 36:  On or about October 15, 2016, SABRI wrote that COMPRESSOR TECH had a current outstanding balance of $2,230,000 with ENERGY COMPANY 1.  SABRI asked that COMPRESSOR TECH's outstanding balance be reduced by $1,000,000 to cover the payment owed by ENERGY COMPANY 1.  As an alternative, SABRI wrote that "[w]e have another account in Hong Kong in USD currency, which you can transfer the amount in USD currency," but "under the condition that [you] do not mention any name of Iran or compressor tech trading; otherwise both party will face problem [sic] and we cannot receive the amount."

Overt Act No. 37:  On or about December 10, 2016, SABRI sent an email to, CHUPRA, ZANGAKANI, and two employees of ENERGY COMPANY 1 entitled "RE: GLOBAL USD --- CCWS --- IRAN MINERAL COMPANY 1 Project"

18

attaching a vendor information account form for ENERGY COMPANY 1 and an invoice regarding the sale of air fin coolers to ENERGY COMPANY 1 for $1,000,000, dated December 7, 2016.  The listed seller was another front company, Global Elite Industrial Plant Equipment and Spare Parts Trading LLC ("GLOBAL INDUSTRIAL").  The forwarded discussion indicated that CHUPRA previously provided SABRI with a U.S.-dollar account number and that CHUPRA had warned SABRI not to mention Iran when depositing the funds.  CHUPRA also asked SABRI to double check the account number for each transaction to make sure the account would not be blocked.

Overt Act No. 38:  On or about February 14, 2017, SABRI emailed an ENERGY COMPANY 1 employee with an "invoice draft with the total amount of USD 1,000,000" and asked the employee for "related bank account details in USD currency from Prime Elite FZE as soon as possible."  SABRI asked that the invoice be prepared on PRIME ELITE letterhead with a signature and stamp.  The employee replied, "I['] m preparing, I will send now."

Overt Act No. 39:  On or about March 9, 2017, ZANGAKANI, CHUPRA, and SABRI, caused ENERGY COMPANY 1 to send $1,000,000 USD to "PRIME ELITE FZE IRAN MANUFACTURING COMPANY 1" at the National Bank of Fujairah in the U.A.E.  The transaction was processed through a U.S. correspondent account held at U.S. FINANCIAL INSTITUTION 1 in New York.

The Conspirators Used U.S. Dollars to Buy Heavy Machinery from ENERGY COMPANY 1 on Behalf of Iran

Overt Act No. 40:  On or about May 9, 2016, ZANGAKANI received two emails from a representative of COMPRESSOR TECH.  The emails

requested the payments of $750,000 and $62,743.20 to ENERGY COMPANY 1.

Overt Act No. 41:   On May 11 and May 12, 2016, EXPROM sent $62,743.20 and $750,000 to ENERGY COMPANY 1.  The emails included attachments of documents on COMPRESSOR TECH letterhead which authorized the payments.  The transactions were conducted through U.S. FINANCIAL INSTITUTION 1 as the intermediary bank.

Overt Act No. 42:   On or about November 26, 2016, SABRI informed an ENERGY COMPANY 1 representative that a payment of $1,230,000 had been made to ENERGY COMPANY 1.  In the communication, SABRI reiterated and underlined the following: "do not mention Iran name at all" (underline in original).  On December 5, 2016, SABRI also informed an employee of ENERGY COMPANY 1 and CHUPRA of COMPRESSOR TECH's finance department that the payment to ENERGY COMPANY 1 needed to be in U.S. dollars.

Overt Act No. 43:   On or about December 5, SABRI asked ZANGAKANI to provide an invoice in the amount of $1,000,000 USD with a matching letterhead, as well as an account for the U.S.-dollar transaction.  CHUPRA forwarded the email, which included SABRI's underlined instruction to not mention Iran, to an employee of ENERGY COMPANY 1 and requested that the employee complete the "attached form" requested by finance.  The attached form was ENERGY COMPANY 1's vendor account information form.  The following day the ENERGY COMPANY 1 employee sent CHUPRA the vendor request form with PRIME ELITE FZE's account information included.

Overt Act No. 44:   On or about December 12, 2016, the employee of ENERGY COMPANY 1 emailed CHUPRA and stated, "we got a message today [from] the [correspondent] bank that 570,000 USD is on hold and

there are some inquiries from the bank they also need an invoice for the related payment."

Overt Act No. 45:   On or about December 12, 2016, CHUPRA responded and provided an attachment consisting of a commercial invoice on ENERGY COMPANY 1 letterhead.  The invoice indicated COMPRESSOR TECH had initially purchased four two-stage integrally geared compressors from ENERGY COMPANY 1 on December 30, 2014 for $1,465,000 USD for a project titled "IRAN MINERAL COMPANY 1." According to the invoice, a third payment of $570,000 USD, 39% of the contract, was due.

Transfer of Funds into the United States, Including the Central District of California

Overt Act No. 46:   On or about January 11, 2016, an employee of IRAN HOLDING COMPANY 1 emailed ZANGAKANI to ask him to transfer $66,766 to a Santa Monica, California-based company.  The purpose of the transfer was for "Purchasing Electronic Equipment."

Overt Act No. 47:   On or about January 14, 2016, EXPROM sent $66,756 to the Santa Monica-based company with an account held at a U.S. financial institution.  The reference information on the wire transfer details stated, "import of electronic equipment."

//
//
//
//
//
//
//
//

Overt Act No. 48:   On or about July 17, 2018, an employee of ROSCO INVESTMENT emailed ZANGAKANI a wire transfer receipt reflecting a payment of $500,000 to U.S. TECHNOLOGY COMPANY 1 on behalf of the front company GLOBAL ELITE.

A TRUE BILL

/S/
_____
Foreperson

TRACY L. WILKISON
Acting United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

ANNAMARTINE SALICK
Assistant United States Attorney
Chief, Terrorism and Export Crimes Section

MARK TAKLA
Assistant United States Attorney
Deputy Chief, Terrorism and Export Crimes
Section

WILLIAM M. ROLLINS
Assistant United States Attorney
Terrorism and Export Crimes Section